UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :

WILLIAM P. COLMAN,              :    Case No.: _____

                Plaintiff,        :    **COMPLAINT**

                            :

     -against-            :    **DEMAND FOR JURY TRIAL**

                            :

SRC ENERGY, INC. LYNN A. PETERSON, :
RAYMOND E. MCELHANEY, JACK     :
AYDIN, DANIEL E. KELLY, PAUL KORUS, :
JENNIFER S. ZUCKER and JAMES P.   :
HENDERSON,                     :

                            :

            Defendants.       :

                            :
-------------------------------------- X

Plaintiff, William P. Colman ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This is an action brought by Plaintiff against SRC Energy, Inc. ("SRC" or the "Company") and the members of the Company's executive officers and board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with SRC, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), SEC Rule 14a-9, and 17 C.F.R. § 240.14a-9, in connection with the proposed merger (the "Proposed Merger") between SRC and PDC Energy, Inc. ("PDC").

2.     On August 25, 2019, SRC entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to ach eligible share of SRC common stock (other than shares

held in treasury by SRC or shares owned by PDC and, in each case, not held on behalf of third parties) will be converted into the right to receive 0.158 of a share of PDC common stock, with cash in lieu of any fractional shares (the "Merger Consideration"). The entirety of the Merger Consideration is valued at approximately $1.7 billion.  Upon closing of the transaction, PDC shareholders will own approximately 62 percent of the combined company, and SRC shareholders will own approximately 38 percent, on a fully diluted basis.

3.      On November 13, 2019, in order to convince SRC's shareholders to vote in favor of the Proposed Merger, Defendants authorized the filing of a materially incomplete and misleading joint proxy amended statement/prospectus on Form S-4/A (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for SRC, PDC, and the combined company; (ii) the valuation analyses performed by Citi in support of its fairness opinion; (iii) the valuation analyses performed by Goldman in support of its fairness opinion; and (iv) the background of the Proposed Merger.

5.      The special meeting of SRC shareholders to vote on the Proposed Merger is forthcoming as the transaction is set to close in the first quarter of 2020.  It is imperative that the material information that has been omitted from the Proxy is disclosed prior to special meeting of SRC's shareholders to vote on the Proposed Merger so Plaintiff can cast an informed vote and properly exercise his corporate suffrage rights.

6.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act.  Plaintiff seeks to

enjoin Defendants from taking any steps to consummate the Proposed Merger until the material information discussed herein is disclosed to SRC's shareholders sufficiently in advance of the special meeting of SRC's shareholders or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

8.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman* 764 F.2d 1309, 1305 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* At 1316

9.      Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. SRC's common stock trades on New York Stock Exchange ("NYSE"), which is headquartered in this District. In addition, SRC hired Citigroup Global Markets Inc. ("Citi") and Goldman & Co. LLC ("Goldman") as financial advisors for the purposes of the Proposed Merger, both of which

are also headquartered in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10.     Plaintiff is, and at all relevant times has been, a holder of SRC common stock.

11.     Defendant SRC is incorporated in Colorado and maintains its principal executive offices at 1675 Broadway, Denver, Colorado 80202. The Company's common stock trades on the NYSE under the ticker symbol "SRCI".

12.     Individual Defendant Lynn A. Peterson ("Peterson") is, and has been at all relevant times, Chief Executive Officer, President and Chairman of the Board. Peterson joined the Company in May 2015.

13.     Individual Defendant Raymond E. McElhaney is, and has been at all relevant times, a director of the Company and has been since May of 2005.

14.     Individual Defendant Jack Aydin is, and has been at all relevant times, a director of the Company and has been since July of 2014.

15.     Individual Defendant Daniel E. Kelley is, and has been at all relevant times, a director of the Company and has been since February of 2016.

16.     Individual Defendant Paul Korus is, and has been at all relevant times, a director of the Company and has been since June of 2016.

17.     Individual Defendant Jennifer S. Zucker is, and has been at all relevant times, a director of the Company.

18.     Individual Defendant James P. Henderson is, and has been at all relevant times, Executive Vice President and Chief Financial Officer.

19.     The Individual Defendants referred to in ¶¶ 12-18 are collectively referred to herein

as the "Individual Defendants" and/or the "Board", and together with SRC they are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.  The Proposed Merger

20.    SRC is an oil and natural gas company, which engages in the acquisition, exploration, development, and production of oil, natural gas, and natural gas liquids primarily in the Denver-Julesburg Basin of Colorado. The company was founded in 2005.

21.    PDC is an oil and natural gas company, which engages in exploration and production, specifically it acquires, explores for, develops, and produces crude oil, natural gas, and natural gas liquids in the United States. Its operations are primarily located in the Wattenberg Field in Colorado and the Delaware Basin in Texas. The company was formerly known as Petroleum Development Corporation and changed its name to PDC Energy, Inc. in June 2012. PDC was founded in 1969 and is headquartered in Denver, Colorado.

22.    On August 26, 2019, SRC and PDC issued a joint press release announcing the Proposed Merger, which states in relevant part:

**PDC Energy Announces Strategic Combination with SRC Energy In All-Stock Transaction**

DENVER, Aug. 26, 2019 (GLOBE NEWSWIRE) -- PDC Energy, Inc. ("PDC" or the "Company") (NASDAQ: PDCE) and SRC Energy, Inc. ("SRC") (NYSE: SRCI) today announced they have entered into a definitive merger agreement under which PDC will acquire SRC in an all-stock transaction valued at approximately $1.7 billion, including SRC's net debt of approximately $685 million as of June 30, 2019. Under the terms of the agreement, SRC shareholders will receive a fixed exchange ratio of 0.158 PDC shares for each share of SRC common stock, representing an implied value of $3.99 per share based on the PDC closing price as of August 23, 2019. The transaction, which is expected to close in the fourth quarter of 2019, has been unanimously approved by each company's board of directors.

**Key Transaction Highlights:**

5

- Materially increases PDC's scale with a consolidated, contiguous Core Wattenberg leasehold position of approximately 182,000 net acres located entirely in Weld County and pro forma second quarter 2019 total production of nearly 200,000 barrels of oil equivalent ("Boe") per day (166,000 Boe per day in the Wattenberg). On a pro forma basis, the combined company is the second largest producer in the DJ basin. Coupled with its approximate 36,000 net acre Delaware Basin position, the Company will have core assets in two of the premier U.S. onshore basins.

- Materially enhances free cash flow profile and enhances ability to return additional capital to shareholders. Pro forma free cash flow is estimated to be approximately $800 million from the third quarter of 2019 through year-end 2021, assuming $55 per barrel NYMEX. PDC has increased and extended its existing share repurchase program from $200 million to $525 million, with a target completion date of year-end 2021. Year-to-date, PDC has repurchased $125 million of its shares and plans to utilize approximately 50 percent of the estimated $800 million of free cash flow in the same period to complete the remaining $400 million repurchase program.

- Creates a low-cost mid-cap producer with anticipated peer-leading G&A of approximately $2.00 per Boe in 2020. PDC expects to realize approximately $40 million of G&A savings in 2020 with an incremental $10 million of G&A synergies in 2021, after the completion of its integration plan.

- All-stock transaction ensures the combined company will have a strong balance sheet with a pro forma leverage ratio of 1.3x at June 30, 2019 and projected leverage ratio of approximately 1.0x at year-end 2020, assuming $55 per barrel NYMEX.

- The transaction is expected to be immediately accretive to key 2020 metrics, including: free cash flow per share, cash return on capital invested ("CROCI"), net asset value, G&A per Boe, LOE per Boe, leverage ratio and inventory life.

**CEO Commentary**

"SRC's complementary, high-quality assets in the Core Wattenberg, coupled with our existing inventory and track record of operational excellence will create a best-in-class operator with the size, scale and financial positioning to thrive in today's market," said Bart Brookman, President and Chief Executive Officer of PDC. "We remain committed to our core Delaware Basin acreage position and are confident the combined company with its multi-basin focus will be well-positioned to deliver superior shareholder returns. With an even more competitive cost structure, including peer-leading G&A and LOE per Boe, the combined company will have

6

the financial flexibility and sustainable free cash flow to return significant capital to shareholders and capitalize on additional growth opportunities."

Brookman continued, "Importantly, this transaction will join two organizations grounded in strong core values and a shared commitment to responsible and safe operations. Both PDC and SRC have deep regulatory and community relationships, and together we will continue to prioritize the health and safety of our employees and stakeholders, as well as the environment and the communities in which we live and operate. We look forward to working with SRC to integrate these two companies and achieve our shared objectives."

Lynn A. Peterson, Chief Executive Officer and Chairman of the Board of SRC Energy commented, "I am proud of the SRC team and the high-quality acreage and low-cost operations we have built together. We believe that this transaction will establish the combined company as a leader in the Colorado energy industry. The transaction also provides SRC shareholders with the opportunity to participate in the significant upside potential created by a larger-scale DJ Basin producer with complementary assets in the prolific Delaware Basin. We look forward to working closely with PDC to ensure that the full potential of this combination is realized for the benefit of all of our stakeholders."

**Strategic and Financial Benefits of the Combination**

- **Creates a Leading Colorado Energy Producer.** On a pro forma basis, PDC will have approximately 182,000 consolidated Core Wattenberg net acres, of which nearly 100 percent is located in Weld County, Colorado. The consolidated footprint will enable an efficient, clearly-communicated long-term development plan with a focus on minimizing surface usage through capital efficient long-laterals and continued emphasis on eliminating trucking, as over 95 percent of anticipated oil production will be transported via pipeline. Approximately 80 percent of the pro forma gross acreage position is in unincorporated rural Weld County, while the remaining 20 percent is located within Weld County local municipal boundaries, with the city of Greeley accounting for approximately half of that total. PDC commits to continue its investment in its community-focused programs while actively engaging with local communities, regulators and elected officials to safely and responsibly develop its leasehold position. Approximately half of municipal permits submitted have received local approval, with the remaining in process.

- **Enhances Size and Scale.** Including both the DJ and Delaware Basin, the pro forma company has year-end 2018 SEC proved reserves of approximately 850 MMBoe and expects to exit 2019 producing approximately 200,000 Boe per day. Anticipated 2019 Wattenberg production of approximately 166,000 Boe per day will make the combined

company one of the largest producer in the DJ Basin and strengthens its relationships with service and midstream providers. Based on PDC's planned 2020 Wattenberg activity level of three drilling rigs, the transaction will increase PDC's Wattenberg inventory life to greater than ten years with additional upside should PDC implement SRC's spacing assumptions to portions of its pro forma position.

- **Improves Free Cash Flow Profile.** The transaction is expected to be immediately accretive to PDC's free cash flow and free cash flow per share in 2020. Assuming $55 per barrel NYMEX oil, the pro forma company expects to generate approximately $800 million of free cash flow between the second half of 2019 and year-end 2021. Approximately half of this sum is expected to be returned to shareholders through the increased share repurchase program, which has a target completion date of year-end 2021. The remaining free cash flow will provide the flexibility to pay down debt, return incremental capital to shareholders and capitalize on accretive growth opportunities.

- **Drives Significant Corporate Synergies.** PDC expects the combination to generate significant corporate synergies including annual G&A savings of approximately $50 million. PDC expects to realize approximately $40 million of G&A savings in 2020, resulting in an anticipated pro forma 2020 G&A of approximately $2.00 per Boe. Following an integration period, the PDC expects an incremental $10 million of G&A synergies in 2021. Additionally, PDC anticipates its pro forma margins per Boe will improve following the completion of the transaction as it expects to benefit from an oilier production mix, lower G&A per Boe and slightly improved LOE per Boe.

- **Maintains Strong Balance Sheet and Financial Flexibility.** The pro forma company will maintain a strong, through-cycle balance sheet with pro forma leverage of 1.3x as of June 30, 2019 and an estimated year-end 2020 leverage ratio of approximately 1.0x. PDC expects to have ample liquidity on its pro forma borrowing base after closing. PDC's increased scale and conservative financial profile, is expected to enhance its credit profile and decrease its overall cost of capital.

**Preliminary Pro Forma 2020 Outlook**

PDC's long-term strategy is to be a low-cost operator that generates and returns free cash flow to shareholders, while delivering solid production and cash flow growth on a debt-adjusted per share basis. In 2020, PDC plans to invest between $1.2 billion and $1.4 billion to operate three Wattenberg and two Delaware Basin drilling rigs. The plan is expected to generate approximately $275 million in free cash flow assuming $55 per barrel and $2.70 per Mcf NYMEX oil and gas prices,

respectively, with full-year production averaging between 200,000 and 220,000 Boe per day. Finally, PDC expects its combined G&A and LOE to be less than $5 per Boe.

**Transaction Details**

Under the terms of the agreement, SRC shareholders will receive a fixed exchange ratio of 0.158 PDC shares for each share of SRC common stock they own, representing an implied value of $3.99 per SRC share based on PDC's closing common stock price on August 23, 2019, or $1.7 billion in the aggregate including the assumption of approximately $685 million in debt. The consideration represents a premium of 6.8 percent to the 30-day average exchange ratio of 0.148x. Upon closing of the transaction, PDC shareholders will own approximately 62 percent of the combined company, and SRC shareholders will own approximately 38 percent, on a fully diluted basis. The all-stock transaction is intended to be tax-free to SRC shareholders.

23.     The Merger Consideration represents inadequate compensation for SRC shares. Given the Company's strong recent financial performance and bright economic outlook, it is imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and cast an informed vote on the Proposed Merger.

**B.  The Proxy Omits Material Information**

24.     On October 23, 2019, Defendants filed the materially incomplete and misleading Proxy with the SEC. The Shareholder Vote is looming over these proceedings and is scheduled for the fourth quarter of 2019. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision in connection with the Proposed Merger.

**i.     The Proxy Contains Materially Misleading Statements and Omissions Concerning Company Projections**

9

25.     The Proxy selectively discloses management's financial projections for the Company with such selective disclosures being materially misleading to shareholders. The projections are material in that the financial advisors relied upon them in preparing their fairness opinions. Citi discloses that it relied upon "certain financial forecasts and other information and data relating to SRC and PDC provided to and/or discussed with Citi by the managements of SRC and PDC, including certain internal financial forecasts and other information and data relating to SRC prepared by the management of SRC, and certain internal financial forecasts and other information and data relating to PDC prepared by the management of PDC as reviewed and approved by the management of SRC." Proxy at 95. Also, in rendering its own fairness opinion, Goldman relied upon "certain internal financial analyses and forecasts for SRC prepared by its management" and "for PDC stand-alone prepared by its management" and "certain financial analyses and forecasts for PDC pro forma for the merger prepared by the management of PDC." *Id.* at 100-101. Therefore, as the fairness opinions are material to shareholders, these projections must be disclosed.

26.     In these projections, the Proxy most alarmingly fails to disclose the projected unlevered free cash flows. The projected unlevered free cash flows are material to shareholders as they are a critical metric when evaluating a company. Indeed, Citi and Goldman utilized the projected unlevered free cash flows provided by management in creating their *Discounted Cash Flow Analysis*—a critical analysis when providing their opinion regarding the fairness of the Merger Consideration. *Id*. at 97-98, 103. One of the most influential books ever to come out on investing, written by professors Benjamin Graham and David Dodd of Columbia Business School, states that as to free cash flows:

10

> Most value investors today analyze free cash flow. This is the cash generated annually from the operations of a business after all capital expenditures are made and changes in working capital are considered. Investors have increasingly turned to [free cash flows] because reported earnings can be an accounting fiction, masking the cash generated by a business or implying positive cash generation when there is none. Today's investors have rightly concluded that following the cash—as the manager of a business must do—is the most reliable and revealing means of assessing a company.

Benjamin Graham & David L. Dodd, *Securities Analysis 6th Edition*, xxx (2008).

27.    In addition to the absence of free cash flow disclosures, the Proxy fails to disclose:

(1) Adjusted EBITDA (2019 to 2020, as used by Citi in its *Public Company Analysis*);

(2) CFPS (2019 to 2020, as used by Citi in its *Public Company Analysis*);

(3) NYMEX Strip Pricing (for all periods applicable, as used by Citi in its *Net Asset Value Analysis*);

(4) Future estimates of proved developed producing reserves and currently undeveloped resources (for all periods applicable, as used by Citi in its *Net Asset Value Analysis*);

(5) Post-tax corporate expenses, and all applicable line items used in the calculation of post-tax corporate expenses (for all periods applicable, as used by Citi in its *Net Asset Value Analysis*);

(6) Net hedge gains and losses (for all periods applicable, as used by Citi in its *Net Asset Value Analysis*);

(7) Additional payments from the sale of PDC's midstream assets (for all periods applicable, as used by Citi in its *Net Asset Value Analysis*);

(8) Future commodity pricing (for all periods applicable, as used by Goldman in its *Net Asset Analysis*);

11

(9) Estimated mark to market commodity hedges (for all periods applicable, as used by Goldman in its *Net Asset Value Analysis*);

(10)     General and administrative costs (for all periods applicable, as used by Goldman in its *Net Asset Value Analysis*);

(11)     Taxes payable (for all periods applicable, as used by Goldman in its *Net Asset Value Analysis*);

(12)     Net operating losses (for all periods applicable, as used by Goldman in its *Net Asset Value Analysis*);

(13)     Certain contingent payments due by PDC (for all periods applicable, as used by Goldman in its *Net Asset Value Analysis*); and

(14)     EBITDA estimates (2021 to 2024, as used by Goldman in its *Present Value of Future Share Price Analysis*).

28.     The absence of unlevered free cash flow projections and the other projections within the Proxy, but the inclusion of other projections, renders statements made as to all financial projections misleading to shareholders. "Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up." *See Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1125 (8th Cir. 2019) (citing *Mendell v. Greenberg*, 927 F.2d 667, 670 (2d Cir. 1990)). In this case, only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate. This must be the case as financial projections may easily be manipulated in order to fit a narrative. Consequently, regarding future events, uncertain figures, and other "soft" information, a company may choose either to remain silent or speak with full and comprehensive veracity—but it may not provide half-truths. This omitted information is

necessary for SRC stockholders to make an informed decision on whether to vote in favor of the Proposed Transaction.

>    ii.    **The Proxy Contains Materially Incomplete and Misleading Disclosures Concerning Citi's Financial Analyses**

29.    With respect to the *Selected Public Companies Analysis* (PDC), the Proxy fails to disclose the individual multiples, for each of the selected public companies analyzed, for calendar year 2019 estimated adjusted EBITDA, calendar year 2020 estimated adjusted EBITDA, calendar year 2019 estimated CFPS, and calendar year 2020 estimated CFPS. The Proxy also fails to disclose whether Citi performed any type of benchmarking analysis for PDC in relation to the selected public companies.

30.    With respect to the *Selected Public Companies Analysis* (SRC), the Proxy fails to disclose the individual multiples, for each of the selected public companies analyzed, for calendar year 2019 estimated adjusted EBITDA, calendar year 2020 estimated adjusted EBITDA, calendar year 2019 estimated CFPS, and calendar year 2020 estimated CFPS. The Proxy also fails to disclose whether Citi performed any type of benchmarking analysis for SRC in relation to the selected public companies.

31.    With respect to the *Net Asset Value Analysis* (SRC), the Proxy fails to disclose the projection time period over which the analysis was conducted. The Proxy also fails to disclose the individual numerical inputs and assumptions used by Citi to determine the discount rate range of 9.5% to 11.0% used in the analysis. Furthermore, the Proxy does not disclose the definition of unlevered, after-tax free cash flow, as used by Citi in the analysis. Finally, the Proxy fails to disclose SRC's estimated net debt as of June 30, 2019, as used by Citi in the analysis.

32.    With respect to the *Net Asset Value Analysis* (PDC), the Proxy fails to disclose the

projection time period over which the analysis was conducted. The Proxy also fails to disclose the individual numerical inputs and assumptions used by Citi to determine the discount rate range of 8.3% to 9.6% used in this analysis. Furthermore, the Proxy does not disclose the definition of unlevered, after-tax free cash flow, as used by Citi in the analysis. Finally, the Proxy fails to disclose PDC's estimated net debt as of June 30, 2019, as used by Citi in the analysis.

### iii. The Proxy Contains Materially Incomplete and Misleading Disclosures Concerning Goldman's Financial Analyses

33.     With respect to the *Discounted Cash Flow Analysis*—SRC Standalone, the Proxy fails to disclose the individual numerical inputs and assumptions used by Goldman to calculate the discount rate range of 7.50% to 9.00% used in the analysis. Additionally, the Proxy fails to disclose the definition of unlevered free cash flow, as used by Goldman in the analysis. The Proxy further fails to disclose SRC's estimated net debt as of June 30, 2019, as used by Goldman in the analysis. The Proxy also fails to disclose the actual estimated terminal year EBITDA amount used in the analysis, as well as the specific time periods and actual data sets of EBITDA multiples, next-twelve-months EBITDA, and "other things" used by Goldman to derive the range of terminal EBITDA multiples used in the analysis. The Proxy fails to disclose the range of implied perpetuity growth rates resulting from the analysis. Finally, the Proxy fails to disclose whether stock-based compensation was treated as a cash or non-cash expense for purposes of the analysis.

34.     With respect to the *Discounted Cash Flow Analysis*—PDC Standalone, the Proxy fails to disclose the individual numerical inputs and assumptions used by Goldman to calculate the discount rate range of 7.50% to 9.00% used in the analysis. Additionally, the Proxy fails to disclose the definition of unlevered free cash flow, as used by Goldman in the analysis. The Proxy further fails to disclose PDC's estimated net debt as of June 30, 2019, as used by Goldman in the

14

analysis. The Proxy also fails to disclose the values of the range of the estimated present value of the unconditional contingent payment to be made to PDC in connection with the same of its midstream assets. Furthermore, the Proxy fails to disclose the actual estimated terminal year EBITDA amount used in the analysis, as well as the specific time periods and actual data sets of EBITDA multiples, next-twelve-months EBITDA, and "other things" used by Goldman to derive the range of terminal EBITDA multiples used in the analysis. The Proxy fails to disclose the range of implied perpetuity growth rates resulting from the analysis. Finally, the Proxy fails to disclose whether stock-based compensation was treated as a cash or non-cash expense for purposes of the analysis.

35.     With respect to the *Discounted Cash Flow Analysis*—Valuation Uplift, the Proxy fails to disclose the individual numerical inputs and assumptions used by Goldman to calculate the discount rate range of 7.5% to 9.0%. The Proxy also fails to disclose the definition of unlevered free cash flow, as used by Goldman in the analysis. Furthermore, the Proxy fails to disclose the pro forma estimated net debt as of June 30, 2019, as used by Goldman in the analysis. In addition, the Proxy fails to disclose the actual estimated terminal year EBITDA amount for the pro forma combined company, as used by Goldman in this analysis. The Proxy further fails to disclose the number of fully diluted outstanding shares of the pro forma combined company, as used by Goldman in the analysis. The Proxy also fails to disclose the range of implied perpetuity growth rates resulting from the analysis. Finally, the Proxy fails to disclose whether stock- based compensation was treated as a cash or non-cash expense for purposes of the analysis.

36.     With respect to the *Net Asset Value Analysis*—SRC, the Proxy fails to disclose the projection time period over which the analysis was conducted. The Proxy also fails to disclose the individual numerical inputs and assumptions used by Goldman to determine the discount rate

range of 7.5% to 9.0% used in the analysis. In addition, the Proxy fails to disclose the definition of after-tax free cash flow, as used by Goldman in the analysis. Furthermore, the Proxy fails to disclose SRC's present value of estimated mark to market commodity hedges and SRC's present value of general and administrative costs, as used by Goldman in the analysis. The Proxy also fails to disclose SRC's estimated face value of net debt as of June 30, 2019, as used by Goldman in the analysis. Finally, the Proxy fails to disclose the SRC's present value of taxes payable, as used by Goldman in the analysis.

37.    With respect to the *Net Asset Value Analysis*—PDC Standalone, the Proxy fails to disclose the projection time period over which the analysis was conducted. The Proxy also fails to disclose the individual numerical inputs and assumptions used by Goldman to determine the discount rate range of 7.5% to 9.0% used in the analysis. In addition, the Proxy fails to disclose the definition of after-tax free cash flow, as used by Goldman in the analysis. Furthermore, the Proxy fails to disclose PDC's present value of pre-tax future cash flows, net operating losses and general and administrative costs, as used by Goldman in the analysis. The Proxy also fails to disclose PDC's estimated face value of net debt as of June 30, 2019, as used by Goldman in the analysis. The Proxy further fails to disclose the PDC's present value of taxes payable, as used by Goldman in the analysis. Finally, the Proxy fails to disclose the amount of certain contingent payments due by PDC, as used by Goldman in the analysis.

38.    With respect to the *Present Value of Future Share Price Analysis*—SRC, the Proxy fails to disclose the specific time periods and actual data sets of EBITDA multiples, next-twelve- months EBITDA, and "other things" used by Goldman to derive the range of terminal EBITDA multiples used in the analysis. The Proxy further fails to disclose the specific estimates of future net debt for SRC, and any other financial items added or subtracted to convert future

16

EV to equity value, for each of the applicable years of the analysis, as used by Goldman in the analysis. Finally, the Proxy fails to disclose the individual numerical inputs and assumptions used by Goldman to determine the cost of equity discount rate of 8.6% used in the analysis.

39.     With respect to the *Present Value of Future Share Price Analysis*—PDC Standalone, the Proxy fails to disclose the specific time periods and actual data sets of EBITDA multiples, next-twelve-months EBITDA, and "other things" used by Goldman to derive the range of terminal EBITDA multiples used in the analysis. The Proxy further fails to disclose the specific estimates of future net debt for PDC, and any other financial items added or subtracted to convert future EV to equity value, for each of the applicable years of the analysis, as used by Goldman in the analysis. Finally, the Proxy fails to disclose the individual numerical inputs and assumptions used by Goldman to determine the cost of equity discount rate of 8.6% used in the analysis.

40.     With respect to the *Present Value of Future Share Price Analysis*—Valuation Uplift, the Proxy fails to disclose the specific time periods and actual data sets of EBITDA multiples, next-twelve-months EBITDA, and "other things" used by Goldman to derive the range of terminal EBITDA multiples used in the analysis. The Proxy further fails to disclose the specific estimates of future net debt, and any other financial items added or subtracted to convert future EV to equity value, for the combined pro forma company, for each of the applicable years of the analysis, as used by Goldman in the analysis. Finally, the Proxy fails to disclose the individual numerical inputs and assumptions used by Goldman to determine the cost of equity discount rate of 8.6% used in the analysis.

    **iv.     The Proxy Contains Materially Incomplete and Misleading Disclosures Concerning the Flawed Process**

41.     The Proxy also fails to disclose material information concerning the sales process. For example, the Proxy notes that in 2018 and early 2019, PDC had a dialogue with SRC concerning a potential transaction. Yet the Proxy does not disclose when that dialogue began and who initiated the dialogue.

42.     In March 2019, Defendant Peterson and the CEO of PDC discussed certain post-closing governance issues relating to the combined company. The Proxy does not disclose the nature of those governance issues or how such issues might impact SRC's stockholders.

43.     On numerous occasions, both Citi and Goldman discussed preliminary financial analyses with the Board. The Proxy does not disclose these financial analyses, including: the preliminary financial analyses discussed with the Board on August 7, 2019; the preliminary financial analyses discussed with the Board on August 14, 2019; the preliminary financial analyses discussed with the Board on August 23, 2019; and the financial analyses discussed with the Board on August 25, 2019.

44.     The Board determined to ask PDC for seats on the board of directors for the post-closing company. On August 11, 2019, PDC's board of directors indicated that they wanted Defendants Peterson and Korus to join the board of directors for the post-closing company. The Proxy notes that PDC's CEO informed Defendant Peterson of a revised proposal that included two seats on the board of directors for the post-closing company. The Proxy does not disclose, however, whether Defendant Peterson was informed that he and Defendant Korus were preferred by PDC, and, if so, whether the Board was aware that PDC wanted Defendants Peterson and Korus to be the directors to join the board of directors for the post-closing company.

45.     At a few Board meetings, the members of the Board discussed the possibility of SRC remaining a stand-alone company. Yet the Proxy does not disclose whether the Board

looked at SRC's forecasts or projections to determine the feasibility of SRC's continuing as a stand-alone company.

46.     Citi notes in its fairness opinion that it reviewed certain financial forecasts for SRC and PDC in preparing its fairness opinion. However, the Proxy does not disclose whether those financial forecasts are the same as those provided to Goldman and included in the Proxy.

47.     Citi also notes in its fairness opinion that, except for certain reserve reports, Citi was not provided with independent evaluations or appraisals of the assets or liabilities of SRC or PDC. The Proxy does not disclose those reserve reports, how Citi obtained those reserve reports, or whether Goldman was also provided the same reserve reports.

48.     Both Citi and Goldman may receive an additional fee up to $3.5 million at SRC's sole discretion. The Proxy does not disclose when that fee arrangement was agreed to, or what parameters would lead to such a payment.

49.     Citi notes in its fairness opinion that it did not provide financial services to PDC in the two years prior to rendering its fairness opinion. Goldman notes in its fairness opinion that it received compensation for financial advisory and/or underwriting services provided to PDC by its Investment Banking Division to PDC or its affiliates. The Proxy does not disclose whether Citi or Goldman provided any other services to PDC or its affiliates in that same time period.

50.     This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness. Without this information, stockholders were not fully informed as to the defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process. And without all material information, SRC stockholders are unable to make a fully informed decision in connection with the Proposed Transaction and face irreparable harm, warranting the injunctive relief sought herein.

51.    In addition, the Individual Defendants knew or recklessly disregarded that the Proxy omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

52.    Specifically, the Individual Defendants undoubtedly reviewed the contents of the Proxy before it was filed with the SEC. Indeed, as directors of the Company, they were required to do so. The Individual Defendants thus knew or recklessly disregarded that the Proxy omits the material information referenced above and contains the incomplete and misleading information referenced above.

53.    Further, the Proxy indicates that on August 25, 2019, Citi and Goldman reviewed with the Board their financial analyses of the Merger Consideration and delivered to the Board their oral opinions, which were confirmed by delivery of written opinions of the same date, to the effect that the Merger Consideration was fair, from a financial point of view, to SRC stockholders. Accordingly, the Individual Defendants undoubtedly reviewed or were presented with the material information concerning Citi's and Goldman's financial analyses, which have been omitted from the Proxy, and thus knew or should have known that such information has been omitted.

54.    Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

55.    In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming special meeting of SRC shareholders,

Plaintiff will be unable to make an informed decision regarding the Proposed Merger, and is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act

56.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

57.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

58.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

59.     The omission of information from a proxy will violate Section 14(a) if other SEC regulations specifically require disclosure of the omitted information.

60.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Merger.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information

regarding, amongst other things: (i) financial projections for SRC, PDC, and the combined company; (ii) the valuation analyses performed by Citi in support of its fairness opinion; (iii) the valuation analyses performed by Goldman in support of its fairness opinion; and (iv) the background of the Proposed Merger.

61.     In so doing, Defendants made misleading statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

62.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that PJT  reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by PJT, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the financial projections and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual

Defendants were required to, separately, review PJT's analyses in connection with their receipt of the fairness opinion, question PJT as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

63.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

64.     SRC is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

65.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote on the Proposed Merger if such misrepresentations and omissions are not corrected prior to the special meeting of SRC's shareholders.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

66.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

23

herein.

67.     The Individual Defendants acted as controlling persons of SRC within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

68.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

69.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing this document.

70.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their

24

input on the content of those descriptions.

71.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

72.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

73.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the special meeting of SRC shareholders to vote on the Proposed Merger or consummating the Proposed Merger, until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: November 14, 2019

**MONTEVERDE & ASSOCIATES PC**
  */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*